IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| JOEL RAYMOND RUTH, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | CIVIL ACTION NO. 09-2074 |
| MICHAEL J. ASTRUE, | : | |
| Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**MEMORANDUM**

YOHN, J.                                                                                    May 31, 2011

Plaintiff, Joel Raymond Ruth, brings this action under 42 U.S.C. § 405(g) and 42 U.S.C.

§ 1383(c)(3), seeking judicial review of the decision of the Commissioner of Social Security (the

"Commissioner") denying his applications for disabled child's insurance benefits under Title II

of the Social Security Act and for Supplemental Security Income ("SSI") under Title XVI of the

Act. I referred the matter to a magistrate judge, who submitted a report and recommendation

recommending that I affirm the Commissioner's decision to deny plaintiff disability benefits.

Plaintiff has now filed objections to the magistrate judge's report. Although I reject plaintiff's

argument that the record establishes his eligibility for disability benefits, because I cannot

conclude that the Commissioner's determination at the final step of the evaluation process is

supported by substantial evidence, I will sustain plaintiff's objections in part, and I will remand

the matter to the Commissioner for further proceedings consistent with this memorandum.

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. Procedural History

Plaintiff protectively filed applications for disabled child's insurance benefits and SSI on March 7, 2007, when he was eighteen years old and in the twelfth grade, alleging disability as of November 11, 1996, resulting from a central auditory deficiency, a speech impairment, learning difficulties, short-term memory loss, anxiety, and panic attacks. (R. 10, 49, 119.) The Social Security Administration denied plaintiff's claims for disability benefits on June 25, 2007. (R. 10, 52, 56.) Plaintiff timely filed a written request for a hearing, and a hearing was held before an administrative law judge ("ALJ") on November 12, 2008 (R. 10). Plaintiff, represented by counsel, testified at the hearing, as did his mother. The ALJ found that plaintiff was not disabled and issued an adverse decision denying both child's insurance benefits and SSI on December 1, 2008. (R. 10–18.) Plaintiff timely requested review by the Appeals Council. The Appeals Council denied this request for review on April 22, 2009, and as a result the ALJ's decision became the final decision of the Commissioner. (R. 1.)

Plaintiff filed this action on May 19, 2009, seeking review of the Commissioner's decision to deny him disability benefits. I referred the matter to a magistrate judge, who, in a report and recommendation dated October 28, 2010, concluded that the Commissioner's decision was supported by substantial evidence and thus recommended that I affirm the Commissioner's decision. Plaintiff has now filed objections to the magistrate judge's report, arguing that the magistrate judge erred in finding that the ALJ had considered all the relevant evidence in the record. Plaintiff argues that the magistrate judge "simply relied on the ALJ's recitation of the evidence instead of considering whether the evidence as a whole directs a different conclusion."

(Pl.'s Objections to the Report and Recommendation of the U.S. Magistrate Judge ("Pl.'s Objections") at 1.)

### B. Factual Background

On November 11, 1996, when plaintiff was eight years old and in the second grade, he was diagnosed with a "central auditory process disorder." (R. 209–11.) He had been referred for an assessment of central auditory function "because of phonological delay and poor academic performance." (R. 209.) According to the evaluation report, plaintiff was "not comprehending letter sounds or the reading process." (*Id.*) Plaintiff had previously been evaluated by school personnel at the end of kindergarten, at which time they suspected a learning disability, and again in the first grade, at which time he was removed from the regular classroom for "special support services." (*Id.*) According to tests performed when he was in the first grade, plaintiff had a full-scale IQ of 87, a verbal IQ of 82, and a performance IQ of 96. (R. 232.)

Plaintiff received special-education services throughout the remainder of his schooling, and although he ultimately received a high-school diploma, he was reading and doing math at only a fourth-grade level. (R. 183.) During high school, plaintiff also attended Lehigh County Technical Institute, in the hospitality program (R. 129, 326), and after graduating from high school, plaintiff began a program, through his school district's intermediate unit, that provided additional instruction in reading and math. (R. 22–23, 29.)[1]

_____

[1] In a report dated May 25, 2007, the consulting state-agency psychologist, Gerald A. Zimmerman, Ph.D., noted that plaintiff had said that, starting in September, he would be taking a computer-graphics course and driver's education, and that he would also be participating in a work-experience program. (R. 326; *see also* R. 179 (noting on disability application that he would be "starting a new program at the high school for experience in working" beginning August 29, 2007).) It is unclear from the record whether plaintiff participated in these other programs. (*See* R. 29 (mentioning only reading and math at the hearing).) The ALJ noted in his

Plaintiff's mental-health problems began to manifest themselves in 2003, when plaintiff was fourteen years old. After plaintiff reportedly burned his arm with a lighter because he was upset and had been feeling depressed since the death of his father's girlfriend, he was referred to a partial hospitalization program. (R. 244–45.) Plaintiff entered the Adolescent Transitions partial hospitalization program on May 6, 2003, and remained there until he was discharged on May 28, 2003. (R. 260.) At the time of admission, plaintiff reported experiencing hallucinations; he explained that at night he saw shadows that he believed were ghosts and demons that were going to harm him, and he also reported hearing strange, threatening voices. (R. 262.) Dr. William LeBoeuf, an adolescent psychiatrist who treated plaintiff while he was in the partial hospitalization program, diagnosed plaintiff with "major depressive disorder." (R. 260.) Dr. LeBoeuf assigned him a global assessment of functioning ("GAF") score of 30 at the time of admission (R. 263) and a GAF score of 40 at the time of his discharge (R. 260).[2] Dr. LeBoeuf prescribed certain medication and referred plaintiff to a clinic for outpatient therapy and

decision that plaintiff "has received special education services, and is in vocational training" (R. 16), suggesting that plaintiff was attending some sort of vocational program at the time of the hearing. Plaintiff testified at the hearing, however, that he had stopped attending the program at the intermediate unit because of anxiety attacks. (R. 29.)

[2] The GAF score is used to rate an individual's overall level of "psychological, social, and occupational functioning." *DSM-IV-TR* at 32. The GAF scale ranges from 1 to 100 and is divided into ten ranges of functioning. *See id*. "The description of each 10-point range in the GAF scale has two components: the first part covers symptom severity, and the second part covers functioning." *Id.* "[W]here the individual's symptom severity and level of functioning are discordant, the final GAF rating always reflects the worse of the two." *Id.* at 33.

A GAF score of 21 to 30 suggests that "[b]ehavior is considerably influenced by delusions or hallucinations" or signifies a "serious impairment in communication or judgment" or an "inability to function in almost all areas." *Id.* at 34.

A GAF score of 31 to 40 signifies "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.*

medication management. (R. 261.)

Plaintiff was readmitted to the partial hospitalization program on September 10, 2003, as a result of anxiety attacks and hallucinations. (R. 268–69.) Upon admission, he was assigned a GAF score of 30. (R. 271.) He was discharged on September 30, 2003, with a diagnosis of anxiety disorder and was assigned a GAF score of 50 at that time. (R. 268.)[3]

Plaintiff began outpatient therapy in December 2003. Following a psychiatric evaluation on March 3, 2004, Dr. Harold Heckman, the examining psychiatrist, reported that plaintiff "appeared to think and organize material in a very slow manner. It was hard for him to answer questions and he frequently needed the questions to be repeated." According to Dr. Heckman, plaintiff "was able to do one digit multiplication in his head correctly . . . but refused to attempt serial seven subtractions, failing to be able to subtract seven from one hundred."[4] Dr. Heckman noted that plaintiff's "affect was considerably flat," and that "[h]is thought was coherent but not always relevant and his goal direction was fairly poor." Dr. Heckman also noted that plaintiff had not recently experienced any hallucinations. Dr. Heckman assigned plaintiff a GAF score of 45 and recommended that he continue with his medication and therapy. (R. 274–75.)

In a medication progress note on December 16, 2004, Dr. Heckman observed that plaintiff was doing well, notwithstanding that he had discontinued his medications, and concluded that plaintiff's diagnoses of psychosis and anxiety were in remission. (R. 276.)

---

[3] A GAF score of 41–50 suggests "[s]erious symptoms" or "any serious impairment in social, occupational, or school functioning." *DSM-IV-TR* at 34.

[4] As the regulations explain, "[o]n mental status examinations, concentration is assessed by tasks such as having [an individual] subtract serial sevens or serial threes from 100." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.C.3.

In connection with plaintiff's disability claims, plaintiff underwent a psychological examination by a consulting state-agency psychologist, Gerald A. Zimmerman, Ph.D. (R. 325.) In a report dated May 25, 2007, Dr. Zimmerman noted that plaintiff had "some hesitating speech" and that "[s]ometimes it appeared as if [plaintiff] had some trouble locating words," but that plaintiff "was able to communicate adequately" and "could easily be understood." (R. 326.) Dr. Zimmerman stated that plaintiff's "thought processes [were] responsive" and that he was "logical." (R. 327.) According to Dr. Zimmerman's report, plaintiff "worked on all of the tasks with minimal difficulties" and "persisted on the tasks." (R. 329.) Dr. Zimmerman observed that plaintiff "worked diligently and tried to do the best he could." (*Id.*) According to the report, plaintiff "was able to concentrate adequately" (R. 327) and displayed "adequate" judgment (R. 328).

Dr. Zimmerman noted that plaintiff's mood was "stable," although plaintiff reported that "[s]ometimes he does get depressed." Plaintiff reportedly said that he was not currently depressed and that he did not have any suicidal thoughts. Although plaintiff reported that he had had hallucinations when he was about fifteen years old, he reportedly denied any recent "perceptual disturbances." Dr. Zimmerman observed that plaintiff was "not fearful" and did "not demonstrate a great deal of anxiety." (R. 327.)

Plaintiff was given an intelligence test, and according to Dr. Zimmerman's report, plaintiff had a full-scale IQ of 74—which "indicates borderline intellectual functioning"—a verbal IQ of 73, and a performance IQ of 79. (R. 329.) Dr. Zimmerman noted that plaintiff's working memory was "quite limited" and that his "working memory index of 67 [brought] his

overall [IQ] score down somewhat." (R. 330.) Looking at plaintiff's scores on the individual substests, Dr. Zimmerman observed that plaintiff "seems to do well with visual motor tasks." (R. 330–31.) "On the other hand," Dr. Zimmerman observed, "skills that represent concentration and attention were quite limited, especially when trying to manipulate numbers." (R. 331.) Dr. Zimmerman also noted that "[g]eneral vocabulary and verbal expressive skills were limited as well." (*Id.*)

Dr. Zimmerman diagnosed plaintiff with a learning disorder (central auditory processing disorder) and borderline intellectual functioning and assigned him a GAF score of 58. (R. 328.) He concluded that plaintiff could "do simple and repetitive tasks" and was "likely to work well on tasks that require repetition and routine." (R. 331.) He noted that plaintiff "seem[s] to be able to get along with people fairly well" and concluded that "in a world of work he is likely to relate fairly well." (*Id.*) According to Dr. Zimmerman, plaintiff "may work slowly but methodically," but "has the capability of showing motivation and putting forth effort." (*Id.*)

Dr. Zimmerman also completed a "medical source statement" assessing plaintiff's ability to do work-related activities. He reported that there were no or minimal limitations on plaintiff's ability to understand, remember, and carry out short, simple instructions and that there were moderate limitations on his ability to understand, remember, and carry out detailed instructions, as well as to make judgments on simple work-related decisions. Dr. Zimmerman further reported that there were no or minimal limitations on plaintiff's ability to interact appropriately with the public, supervisors, and co-workers, but that there were moderate limitations on his ability to respond appropriately to work pressures in a usual work setting as well as to respond appropriately to changes in a routine work setting. (R. 332–34.)

7

Plaintiff began seeing Dr. Arif Husain, a psychiatrist, on August 7, 2008. At his initial psychiatric evaluation, Dr. Husain observed that plaintiff spoke "softly and need[ed] time to process information and answer questions." Plaintiff reported that in the past he had been treated with medications but that he had stopped taking those medications. He reported that "he gets anxious and angry" and reported "episodes of panic attacks," but denied any recent "psychotic symptoms like hallucinations, delusions or paranoia" and denied that he had any "suicidal thoughts, ideations or plans." Dr. Husain stated that "[a] review of depression at this time shows mild depression and a review of mania shows an inability to focus or concentrate, with mild racing thoughts and irritable mood." Dr. Husain diagnosed plaintiff with bipolar disorder, as well as a learning disorder and borderline intellectual functioning, and assigned him a GAF score of 35. Dr. Husain prescribed new medication and noted that plaintiff "would benefit from individual therapy." He also recommended that plaintiff be referred to a work program so that he could work under supervision. (R. 398–99.)

After canceling two medication-management visits, plaintiff saw Dr. Husain again on September 18, 2008. Plaintiff reported that he was "doing well." Plaintiff "stated that his mood has been improved, but not totally," and because plaintiff reported "some anxiety and paranoia," Dr. Husain adjusted the dosage of his medication. (R. 401–03.)

Approximately one month later, on October 16, 2008, Dr. Husain completed a medical source statement assessing plaintiff's ability to do work-related activities. Dr. Husain stated that he had diagnosed plaintiff with bipolar disorder, a learning disorder, and "mental retardation

unspecified" and in the accompanying checklist of symptoms, identified the following symptoms of plaintiff's disorder: poor memory; sleep disturbance; emotional lability; delusions or hallucinations; recurrent panic attacks; anhedonia or pervasive loss of interests; feelings of guilt or worthlessness; difficulty thinking or concentrating; suicidal ideation or attempts; oddities of thought, perception, speech or behavior; social withdrawal or isolation; manic syndrome; intrusive recollections of a traumatic experience; persistent irrational fears; generalized persistent anxiety; and pathological dependence or passivity. He stated that plaintiff had "severe mental illness" and assigned plaintiff a GAF score of 30. (R. 405.)

Dr. Husain stated that plaintiff was "unable to work" because of his "severe intellectual impairment and mood changes" and reported, by checking a box, that plaintiff's ability to perform the various mental activities associated with work was "poor or none." Specifically, Dr. Husain checked "poor or none" for fifteen of the sixteen listed mental activities: ability to remember locations and work-like procedures; ability to understand, remember, and carry out very short and simple instructions; ability to understand, remember, and carry out detailed instructions; ability to maintain attention and concentration for extended periods (e.g., 2 hours or more at a time); ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to sustain an ordinary routine without special supervision; ability to work in coordination with or proximity to others without being distracted by them; ability to make simple work-related decisions; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a

consistent pace without an unreasonable number and length of rest periods; ability to interact

appropriately with the general public; ability to accept instructions and respond appropriately to

criticism from supervisors; ability to get along with co-workers or peers without distracting them

or exhibiting behavioral extremes; ability to respond appropriately to changes in the work setting;

ability to travel in unfamiliar places or use public transportation; and ability to set realistic goals

or to make plans independently of others. (R. 406–09.)[5]

At his disability hearing, plaintiff testified that he lived with his mother and seventeen-

year-old sister (R. 22) and that he had never worked (R. 23).[6] He testified that he did not have

any friends and had never had a girlfriend, and that he spent most of his time with his mother.

(R. 32.) According to plaintiff, he did not play sports (R. 23) but did "[a] little bit of walking" for

exercise (R. 24). He spent a typical day playing video games, playing with action figures, and

watching television. (R. 26.) He testified that he helped with some household chores, but only

after repeated prodding from his mother. (R. 24–25.) He said that he attended church once or

twice a month. (R. 24.)

When asked by the ALJ to explain "the problems you're experiencing that interfere with

your ability to work," plaintiff replied that he has "anxiety attacks and . . . get[s] very nervous

around people." (R. 25.) Plaintiff testified that he did not drive because he had anxiety attacks

(R. 28) and that he had stopped attending the special program at the intermediate unit because he

had "too many panic attacks" (R. 29). He explained that in high school, he had been in a small

---

[5] Dr. Husain did, however, check "fair" with respect to plaintiff's ability to ask simple questions or request assistance. (R. 408.)

[6] There is no evidence in the record that plaintiff ever attempted to obtain a job.

class, but at the intermediate unit, he was with more people, which made him nervous and scared him. (R. 29–30.) According to plaintiff, while attending the intermediate unit, he had panic attacks four or five times a week; the panic attacks lasted from "a half an hour to an hour" and caused him to feel "cold, shaky and overheated and sweaty." (R. 30.) He testified that when he had such a panic attack, his teacher would take him to the nurse's office, where he would stay until the attack subsided. (*Id.*)

Plaintiff testified that he has difficulty following both written and oral instructions as well as difficulty remembering things. (R. 30–31.) He also testified that he was easily distracted and that when he started something—such as a video game—he generally could not finish it, because he would get distracted. (R. 32.)

Plaintiff's mother also testified at the hearing. She testified that plaintiff could not handle money or make change, and that she handled his savings account for him. (R. 37.) She explained that he could use a washing machine, but only with assistance: "He would need somebody there basically over his shoulder to explain to him what he's supposed to do step-by-step." (R. 37–38.) She testified that he needed the same sort of assistance with heating food in the microwave. (R. 38.) She also testified that he needs constant repetition as well as supervision. (*Id.*)

According to plaintiff's mother, plaintiff got up on his own in the morning, but she used to wake him up when he was in school. (R. 39.) She explained that on a typical day, she would make breakfast for him, and then he would play a video game for about ten or fifteen minutes, until he got distracted. (R. 40.) Then he would do something else—generally, playing with action figures—for a few minutes. (*Id.*) Plaintiff's mother had to remind him to shower and get dressed. (*Id.*) She would prepare his lunch for him, and in the afternoon he would play video games and

play with action figures. (*Id.*) She said that once in a while, he would draw. (*Id.*) She testified that she did "not trust to leave him home alone," because she did not think that he was able to make decisions on his own and she was concerned that if he tried to make himself something to eat, for example, he might cause a fire. (*Id.*) She explained that plaintiff did not have a driver's license, because she and his father were concerned that "he would not be able to drive and pay attention to the signs and other things around him, [be] aware of other things around him." (R. 40–41.)

Plaintiff's mother testified that plaintiff was distracted by noise and other people. She said that he attended church once or twice a month, but explained that he had difficulty sitting for a long period of time and would ask "every two minutes" whether the service was almost over. (R. 41.)

She explained that plaintiff's panic attacks were "sporadic" and were generally triggered by "people or situations that he's not familiar with." (R. 43.)

Finally, plaintiff's mother asserted that she did not think her son would be able to work, because "[h]e needs constant reminders. He needs somebody on his back all the time to remind him of what to do." (R. 44.) She added that he could not read very well and that he would be unable to perform a job that involved numbers. (*Id.*)

## II.   STANDARD OF REVIEW

A district court reviews *de novo* the parts of the magistrate judge's report and recommendation to which either party objects. *See* 28 U.S.C. § 636(b)(1). The district court may accept, reject, or modify, in whole or in part, the magistrate judge's findings or recommendations. *See id.*

With respect to the Commissioner's decision, however, the standard of review is deferential. Although a district court exercises "plenary review" over any legal questions presented by the Commissioner's decision, a court may review the Commissioner's "factual findings only to determine whether the administrative record contains substantial evidence supporting the findings." *Allen v. Barnhart*, 417 F.3d 396, 398 (3d Cir. 2005). As the Supreme Court has explained, "[s]ubstantial evidence 'does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)). This standard requires "more than a mere scintilla" of evidence but "somewhat less than a preponderance of the evidence." *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).

The court may not "weigh the evidence," *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), and may not "set the Commissioner's decision aside if it is supported by substantial evidence, even if [the court] would have decided the factual inquiry differently," *Hartranft*, 181 F.3d at 360; *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). In determining whether the Commissioner's decision is supported by substantial evidence, however, the court must consider "the evidentiary record as a whole, not just the evidence that is consistent with [the Commissioner's] finding." *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by the countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence . . . or if it really constitutes not evidence but mere

13

conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

## III. DISCUSSION

The issue before the ALJ was whether plaintiff was disabled within the meaning of the

Social Security Act and thus entitled to disabled child's insurance benefits and SSI.[7] The Act

defines a disability as the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

---

[7] The eligibility requirements for disabled child's insurance benefits are described in 42 U.S.C. § 402(d), which provides, in relevant part:

   (1) Every child . . . of an individual entitled to old-age or disability insurance benefits, or of an individual who dies a fully or currently insured individual, if such child—
      (A) has filed application for child's insurance benefits,
      (B) at the time such application was filed was unmarried and (i) either had not attained the age of 18 or was a full-time elementary or secondary school student and had not attained the age of 19, or (ii) is under a disability . . . which began before he attained the age of 22, and
      (C) was dependent upon such individual—
         (i) if such individual was living, at the time such application was filed,
         (ii) if such individual has died, at the time of such death, or
         (iii) if such individual had a period of disability which continued until he became entitled to old-age or disability insurance benefits, or (if he has died) until the month of his death, at the beginning of such period of disability or at the time he became entitled to such benefits,
shall be entitled to a child's insurance benefit . . . .
42 U.S.C. § 402(d)(1).
   The eligibility requirements for SSI are described in 42 U.S.C. § 1382, which provides, in relevant part:

   (1) Each aged, blind, or disabled individual who does not have an eligible spouse and—
      (A) whose income, other than income excluded pursuant to section 1382a(b) of this title, is at a rate of not more than [the applicable amount], and
      (B) whose resources, other than resources excluded pursuant to section 1382b(a) of this title, are not more than [the applicable amount],
   shall be an eligible individual for purposes of this subchapter.
42 U.S.C. § 1382(a)(1).

14

or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).[8] The impairment or combination of impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

To determine whether a claimant is disabled and eligible for disability benefits under the Social Security Act, the Commissioner uses a five-step process. *See* 20 C.F.R. § 404.1520. First, the Commissioner considers the claimant's work activity and determines whether the claimant is engaged in "substantial gainful activity." *See id.* § 404.1520(a)(4)(i). If he is, the Commissioner will find that the claimant is not disabled and will deny his application for disability benefits. *See id.* If he is not, the Commissioner proceeds to the second step, and determines whether the claimant has a "severe medically determinable physical or mental impairment" that significantly limits his ability to perform basic work activities. *See id.* § 404.1520(a)(4)(ii), (c). If the claimant's impairment is severe, the Commissioner proceeds to the third step and determines whether the impairment meets or is medically equivalent to one of the "listed impairments" in appendix 1 of the regulations. *See id.* § 404.1520(a)(4)(iii); *id.* pt. 404, subpt. P, app. 1. Because the Commissioner considers these listed impairments to be severe enough to prevent an individual from engaging in any gainful activity, *see id.* § 404.1525(a), if the claimant's impairment is listed in the appendix or is medically equivalent to one of the listed impairments,

---

[8] The relevant statutory and regulatory language governing SSI for disabled individuals is substantially identical to that governing disabled child's insurance benefits. For convenience, I will cite only the relevant provisions for disabled child's insurance benefits in Title II of the Social Security Act and 20 C.F.R. pt. 404.

the Commissioner will find that the claimant is disabled, *see id.* § 404.1520(d).

Even if the impairment does not meet or equal a listed impairment, the inquiry does not end. Rather, the Commissioner proceeds to the fourth step and determines whether the claimant has the "residual functional capacity" to perform his past work. *See id.* § 404.1520(a)(4)(iv). A claimant's residual functional capacity is "the most [he] can still do despite [his] limitations." *Id.* § 404.1545(a)(1). If the claimant can still perform his past work, the Commissioner will find that he is not disabled and will deny his claim for disability benefits. *See id.* § 404.1520(a)(4)(iv). If the claimant cannot perform his past work, or has not engaged in substantial gainful activity within the past fifteen years, *see id.* § 404.1560(b)(1) (defining "past relevant work"), the Commissioner proceeds to fifth and final step and determines whether, given the claimant's residual functional capacity, as well as his age, education, and work experience, the claimant is able to do other work. *See id.* § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner will find that he is not disabled. *See id.* To support a finding that a claimant is not disabled, however, the Commissioner must "provid[e] evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do." *Id.* § 404.1560(c)(2). The claimant bears the burden of proof at each of the first four steps, but the burden of proof shifts to the Commissioner at step five. *See Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

In applying this five-step evaluation process here, the ALJ found that plaintiff had severe mental impairments—namely, a learning disability and depression (R. 12)—but determined, at step three, that these impairments did not meet any of the listed impairments (R. 13–15). The ALJ further found that plaintiff had the residual functional capacity to perform a full range of

work at all exertional levels, provided that such work did not require detailed work tasks. (R. 15–17.) And because he determined that such work exists in significant numbers in the national economy, he concluded that plaintiff was not disabled. (R. 17–18.)

Plaintiff argues that the Commissioner's decision is not supported by substantial evidence. Specifically, plaintiff argues that neither the ALJ's step-three determination that plaintiff's impairments did not meet or equal a listed impairment nor the ALJ's step-five determination that plaintiff has the residual functional capacity to perform work in the national economy is supported by substantial evidence, asserting, in part, that the ALJ failed to consider all the relevant evidence before him.

I agree with plaintiff that the ALJ failed to consider certain relevant evidence in the record in determining whether plaintiff satisfied the criteria for the applicable listed impairment. But because, as discussed more fully below, the ALJ's determination that plaintiff's impairment did not meet a listed impairment would not have been different even if the ALJ had considered that evidence, I will affirm the ALJ's step-three determination. The ALJ's failure to consider this evidence, however, does call into question his ultimate determination, at step five, that plaintiff has the residual functional capacity to perform work in the national economy, and I cannot conclude that the ALJ's determination at this last step is supported by substantial evidence. I will thus remand the matter to the Commissioner.

## A. The ALJ's Step-Three Determination: Whether Plaintiff's Impairments Met or Equaled Listing 12.02

Plaintiff first challenges the ALJ's determination, at step-three of the evaluation process, that plaintiff's impairments did not meet the criteria of listing 12.02.

Listing 12.02 refers to "organic mental disorders," which the regulations describe as "[p]scyhological or behavioral abnormalities associated with a dysfunction of the brain." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.02. Listing 12.02 contains both a set of medical findings, set forth in paragraph A, that "substantiate medically the presence of a particular mental disorder," and a set of impairment-related functional limitations, set forth in paragraph B, that "are incompatible with the ability to do any gainful activity." *Id.* § 12.00.A. Additional functional criteria are set forth in paragraph C, but the Commissioner will assess the paragraph C criteria only if the paragraph B criteria are not satisfied. *See id.* The required level of severity for listing 12.02 disorders is deemed to be met, and the Commissioner will accordingly find that a claimant's impairment satisfies listing 12.02, when the criteria in both paragraphs A and B (or A and C when appropriate) are satisfied. *See id.* §§ 12.00.A, 12.02.

Here, the ALJ found that plaintiff did not satisfy the criteria in either paragraph B or paragraph C.[9]

Paragraph B requires that a claimant's impairments result in at least two of the following:

1. Marked restriction of activities of daily living; or

---

[9] The ALJ did not address whether plaintiff's impairments satisfied the criteria in paragraph A. Because both the paragraph A and the paragraph B criteria must be satisfied in order for an impairment to meet the listing, and because, as discussed below, substantial evidence supports the ALJ's determination that plaintiff did not satisfy the paragraph B criteria, the ALJ's failure to address paragraph A is of no consequence. Plaintiff does not dispute the ALJ's finding with respect to paragraph C.

2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration[.]

*Id.* § 12.02.

The ALJ found that plaintiff's impairments did not satisfy paragraph B, because plaintiff had only a mild restriction in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, and because plaintiff had experienced no episodes of decompensation. (R. 15.)

Plaintiff does not challenge the ALJ's findings with respect to social functioning or episodes of decompensation. But he asserts that the ALJ's findings with respect to plaintiff's activities of daily living and his ability to maintain concentration, persistence, or pace are not supported by substantial evidence, and contends that the evidence in the record instead requires a finding that plaintiff has a marked restriction in activities of daily living and marked difficulties in maintaining concentration, persistence, or pace.

I agree with plaintiff that the ALJ's findings with respect to plaintiff's ability to maintain concentration, persistence, or pace is not supported by substantial evidence. Nonetheless, because a claimant must satisfy at least two of the paragraph B criteria, and because substantial evidence supports the ALJ's determination that plaintiff did not satisfy the other three criteria in paragraph B,[10] I must conclude that substantial evidence supports the ALJ's determination that plaintiff did not meet listing 12.02.

---

[10] Because plaintiff does not challenge the ALJ's findings with respect to social functioning and episodes of decompensation, I do not expressly address whether these findings are supported by substantial evidence.

### 1.      Activities of Daily Living

As used in the listings for mental disorders, "activities of daily living" include "adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for [one's] grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. § 12.00.C.1. The regulations explain that "[i]n the context of [the claimant's] overall situation, [the Commissioner] assess[es] the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. [The Commissioner] will determine the extent to which [the claimant] is capable of initiating and participating in activities independent of supervision or direction." *Id.*

The term "marked" means "more than moderate but less than extreme." *Id.* § 12.00.C. As the regulations explain, "[a] marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.*

The regulations further explain that in assessing a claimant's ability to engage in activities of daily living, the Commissioner does "not define 'marked' by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function." *Id.* § 12.00.C.1. If, for example, a claimant does "a wide range of activities of daily living," the regulations explain, the Commissioner "may still find that [the claimant] ha[s] a marked limitation in [his] daily activities if [he] ha[s] serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions." *Id.*

The magistrate judge concluded that the record contains substantial evidence to support the ALJ's finding that plaintiff was only mildly restricted in performing activities of daily living, and I agree.

As the ALJ noted, in a function report completed on April 13, 2007, in connection with plaintiff's application for disability benefits, plaintiff's mother stated that he was able to perform various personal-care activities without limitation, although he needed to be reminded to shower and brush his teeth. Plaintiff attended school daily and, as the ALJ noted, walked to school by himself. In addition, plaintiff's mother stated in the function report that plaintiff took out the garbage, mowed the lawn, helped with the laundry, cleaned the cat's litter box, and washed the dishes. The ALJ also noted that plaintiff played video games. (R. 130–33.) All of this evidence supports the ALJ's determination that plaintiff did not have a marked limitation in the area of activities of daily living.[11]

Plaintiff argues, however, that the evidence demonstrates that "he has always been far from independent in his 'activities of daily living.'" (Pl.'s Objections at 2.) Plaintiff notes that his

---

[11] To support the ALJ's determination, defendant points to other evidence in the record, asserting that plaintiff "likes to ride 4-wheelers" and that his "mental impairments do not preclude him from making change or shopping for video games, CD's, and DVD's." (Def.'s Resp. to Pl.'s Req. for Review at 8 (internal quotation marks omitted) (citing R. 132, 326).) But although this evidence is in the record, there is no mention of it in the ALJ's decision, and thus I may not rely on it in determining whether the ALJ's determination is supported by substantial evidence. *See Fargnoli v. Massanari*, 247 F.3d 34, 44 n.7 (finding error in the district court's reliance on medical records not mentioned by the ALJ); *Keiderling v. Astrue*, No. 07-2237, 2008 WL 2120154 (E.D. Pa. May 20, 2008) (asserting that it is well established that the "ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision; the Commissioner may not offer a post-hoc rationalization" (internal quotation marks omitted)).

mother wakes him up every morning and must remind him to take a shower and brush his teeth.[12] He further notes that his mother prepares all his meals for him and that he needs assistance with cooking food on the stove or heating food in the microwave. Plaintiff does not dispute that he does various household chores, but asserts that he does so "only after repeated reminders from his mother and with detailed instructions and supervision." (Pl.'s Objections at 2.)

Regardless of whether this evidence might support a finding that plaintiff's ability to engage in activities of daily living was "markedly" impaired, as plaintiff contends, it does not "overwhelm" the other evidence supporting the ALJ's determination. I find here that there is "such relevant evidence as a reasonable mind might accept as adequate" to support the ALJ's determination that plaintiff did not have a marked limitation in the area of activities of daily living and thus that substantial evidence supports that determination. *See Hartranft*, 181 F.3d at 360.

### 2. Concentration, Persistence, or Pace

Plaintiff also argues that the ALJ's determination with respect to concentration, persistence, or pace is not supported by substantial evidence, because the ALJ failed to consider all the relevant evidence before him.[13]

The phrase "concentration, persistence, or pace" refers to "the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of

---

[12] Plaintiff testified that his mother wakes him up. (R. 26.) Plaintiff's mother, however, testified that when he was in school, she would wake him up, but that as of the time of the hearing, he got up on his own. (R. 39.)

[13] Although the magistrate judge discussed some of the evidence relating to plaintiff's concentration, persistence, or pace, the magistrate judge did not expressly address the ALJ's finding with respect to plaintiff's difficulties in this area of functioning.

tasks commonly found in work settings." 20 C.F.R. pt. 404, subpt. P, app. 1, §12.00.C.3. The

regulations explain that in assessing a claimant's concentration, persistence, or pace, the

Commissioner "do[es] not define 'marked' by a specific number of tasks that [the claimant] is

unable to complete, but by the nature and overall degree of interference with function." *Id.* As the

regulations explain, a claimant "may be able to sustain attention and persist at simple tasks but

may still have difficulty with complicated tasks. Deficiencies that are apparent only in

performing complex procedures or tasks would not satisfy the intent of this paragraph B

criterion." *Id.* Even if the claimant can complete many simple tasks, however, the Commissioner

"may nevertheless find that [the claimant] ha[s] a marked limitation in concentration, persistence,

or pace if [he] cannot complete these tasks without extra supervision or assistance, or in

accordance with quality and accuracy standards, or at a consistent pace without an unreasonable

number and length of rest periods, or without undue interruptions or distractions." *Id.*

Here, the ALJ determined that plaintiff has moderate difficulties in maintaining

concentration, persistence, or pace. The ALJ acknowledged that plaintiff "has some cognitive

difficulties but—apparently referring to Dr. Zimmerman's consultative psychological evaluation,

although he did not specify which evidence he was referring to or cite a particular exhibit in the

record—asserted that "on testing, [plaintiff] had adequate concentration and memory." (R. 15.)

Plaintiff contends that the ALJ's determination cannot be said to be supported by

substantial evidence, because the ALJ failed to credit, or properly reject, "a wealth of contrary

evidence before him." (Pl.'s Objections at 3.)

"The ALJ has a duty to hear and evaluate all relevant evidence in order to determine

whether an applicant is entitled to disability benefits." *Cotter v. Harris*, 642 F.2d 700, 704 (3d

Cir. 1981). An ALJ "may not reject pertinent or probative evidence without explanation," *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204, and may not "reject evidence for no reason or for the wrong reason," *Rutherford*, 399 F.3d at 554.

Here, plaintiff asserts that the ALJ improperly failed to consider various school reports submitted as evidence, as well as a teacher questionnaire completed by plaintiff's special-education reading teacher at the request of the state agency assessing plaintiff's disability application.[14] In the teacher questionnaire, plaintiff's teacher reported that plaintiff had a "very serious problem" sustaining attention during play or sports activities, focusing long enough to finish an assigned activity or task, completing work accurately without careless mistakes, working without distracting himself or others, and working at a reasonable pace and finishing on time, and a "serious problem" completing assignments and refocusing to task when necessary. Although plaintiff, in her view, was able to carry out single-step instructions with no problem, she reported that he had a "serious problem" carrying out multi-step instructions. She noted that plaintiff "can be easily distracted when completing a task" and asserted that he "needs frequent positive reinforcement." (R. 185, 190.)

The Social Security Administration has made it clear that "'[n]on-medical sources' who have had contact with the individual in their professional capacity, such as teachers, school counselors, and social welfare agency personnel who are not health care providers, are . . . valuable sources of evidence for assessing impairment severity and functioning." SSR 06-03p,

---

[14] The questionnaire was completed on April 20, 2007, when plaintiff was in the twelfth grade. Plaintiff's teacher stated that she had known him for four years. (R. 183, 190.)

2006 WL 2329939 (Aug. 9, 2006), at *3.[15]

In this case, the ALJ stated in his findings of fact that plaintiff's "school records note difficulties in his ability to maintain attention and to finish tasks" (R. 12), but he did not provide any further discussion of these school records. And it is not possible to determine from the ALJ's decision whether the ALJ even considered this teacher questionnaire,[16] let alone whether he found it consistent with Dr. Zimmerman's evaluation or, to the extent that he found it inconsistent, his reasons for according more weight to Dr. Zimmerman's report.

I note in this respect that "[a]lthough [the regulations] do not address explicitly how to evaluate evidence (including opinions) from 'other sources,' they do require consideration of such evidence when evaluating an 'acceptable medical source's' opinion." SSR 06-03p, 2006 WL 2329939, at *4. And the regulations expressly provide that "[w]henever possible," when the Commissioner is assessing a claimant's concentration, persistence, or pace, "a mental status examination or psychological test data should be supplemented by other available evidence." 20

_____

[15] Social Security Rulings constitute the Social Security Administration's interpretations of the Social Security Act and the regulations promulgated thereunder. Although "Social Security Rulings do not have the force of law, . . . once published, they are binding on all components of the [Social Security Administration]." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 n.4 (3d Cir. 2003).

[16] As support for his statement that plaintiff's "school records note difficulties in his ability to maintain attention and to finish tasks," the ALJ cited exhibits 2F, 8F, 13F, and 14F, which correspond to records from Good Shepherd Rehabilitation Hospital; an evaluation report from Northampton Area School District dated May 17, 2006; a progress report dated June 13, 1997, as well as certain other records from Northampton Area School District; and records from Lehigh Valley Hospital Health Network, including plaintiff's initial psychiatric evaluation with Dr. Husain. The teacher questionnaire is not included in the referenced exhibits.

The ALJ apparently did consider the teacher questionnaire in assessing plaintiff's ability to maintain social functioning, however. The ALJ cited exhibit 8E, which contains the questionnaire, in support of his finding that plaintiff "has no problem in making friends, interacting appropriately with teachers and family members, and following rules." (R. 15.)

C.F.R. pt. 404, subpt. P, app. 1, § 12.00.C.3. Moreover, as the Social Security Administration has explained, "[a]n opinion from a 'non-medical source' who has seen the claimant in his or her professional capacity may, under certain circumstances, properly be determined to outweigh the opinion from a medical source, including a treating source." SSR 06-03p, 2006 WL 2329939, at *6. "[T]his could occur," for example, "if the 'non-medical source' has seen the individual more often and has greater knowledge of the individual's functioning over time and if the 'non-medical source's' opinion has better supporting evidence and is more consistent with the evidence as a whole." *Id.*

Here, plaintiff's teacher reported that she had known plaintiff for four years, which suggests that she might have greater knowledge of plaintiff's functioning over time than Dr. Zimmerman, who examined plaintiff only once. While the ALJ could nonetheless decide to accord more weight to Dr. Zimmerman's evaluation, it is unclear whether he did so here or whether he simply ignored the teacher questionnaire. As the Third Circuit has asserted, a reviewing court "need[s] from the ALJ not only an expression of the evidence [he] considered which supports the result, but also some indication of the evidence which was rejected. In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705. And where, as here, "there is conflicting probative evidence in the record," the Third Circuit has "recognize[d] a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions," and has asserted that it "will vacate or remand a case where such an explanation is not provided." *Fargnoli*, 247 F.3d at 42.

The ALJ's error proved to be harmless at this third step of the analysis: because a

claimant must satisfy at least two of the paragraph B criteria, even if plaintiff does in fact have

marked difficulties in maintaining concentration, persistence, or pace, such a determination

would not change the outcome at this step. But, as discussed in the next section, the ALJ's error

calls into question his assessment of plaintiff's residual functional capacity and thus requires that

I remand the case.[17]

_____

[17] Plaintiff also asserts that the ALJ failed to mention in his decision certain other pieces of evidence, including

- a student profile prepared on February 14, 1996, when plaintiff was in the first grade, which noted, among other things, that plaintiff needed "individual help 95% of time to complete a task," had poor verbal and written expression, was "not able to sit still for more than a few minutes at a time," and needed "constant adult attention" (R. 355–56);
- narrative report cards written by plaintiff's first-grade teacher on April 12, 1996, and June 14, 1996, noting that on reading-fluency tests, plaintiff's average was 8 correct words per minute whereas the average for first-grade students was 34 to 94 words, that plaintiff had difficulty with addition and subtraction, and that a regular second-grade placement was inappropriate because plaintiff was "not ready for the rigors of that curriculum" (R. 349–50, 353–54);
- a May 28, 1996, letter from the school guidance counselor noting that the "rating scales" signified that plaintiff "struggle[d] with inattention and impulsivity" (R. 301–02);
- the "school function" evaluation performed on October 22, 1996, when plaintiff was in the second grade, which noted not only plaintiff's IQ results (cited by the ALJ) but also the ADHD scales (not cited) (R. 232–35);
- the "central auditory function" evaluation performed on November 11, 1996;
- a progress report prepared by plaintiff's second-grade learning-support teacher on June 13, 1997 (R. 364–65);
- a "behavior intervention plan" prepared on April 15, 2003, stating that plaintiff's behaviors were "a function of academic difficulties, poor impulse control and low frustration tolerance" (R. 376);
- an evaluation report prepared by the school psychologist on May 17, 2006 (R. 290–94); and
- an Individualized Education Program (IEP) report prepared on May 31, 2006 (R. 148–52).

As a preliminary matter, I note that a careful review of the evidence reveals that the April 15, 2003, report cited by plaintiff was prepared for plaintiff's brother Josh, not for plaintiff. (*See* R. 376.) Moreover, while the 2006 reports may be relevant in assessing plaintiff's concentration, persistence, or pace, the 1996 and 1997 records are not. The issue before the ALJ, at least initially, was whether plaintiff was currently disabled. Although this evidence may be relevant in understanding the nature of plaintiff's impairments, and although the regulations note that a claimant's "level of functioning may vary considerably over time" and thus that "it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of

### B. The ALJ's Step-Five Determination: Whether Plaintiff Had the Residual Functional Capacity to Perform Jobs in the National Economy

Plaintiff also challenges the ALJ's determination, at step five of the evaluation process, that plaintiff had the residual functional capacity to "perform jobs that exist in significant numbers in the national economy." (R. 17–18.)

Residual functional capacity "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).[18] It represents the most that an individual can still do despite the limitations caused by his impairment. *See* 20 C.F.R. § 404.1545(a)(1).

Here, the ALJ found that plaintiff had "the residual functional capacity to perform a full

_____

adjudication to establish [a claimant's] impairment severity," 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.D.2, evidence of plaintiff's academic problems and difficulty focusing when he was in the first or second grade has little probative value in assessing plaintiff's current ability to maintain concentration, persistence, or pace. Because the ALJ need not provide an explanation for rejecting evidence that is not "pertinent or probative," *Johnson*, 529 F.3d at 204, there was no error in his failure to expressly discuss that evidence. The 2006 reports, although relevant, provide little information beyond what is available from other sources that the ALJ did consider. Indeed, the only evidence from the May 17, 2006 report that plaintiff highlights in his brief is the assessment that plaintiff was "six grade levels behind in math, [his] reading skills were severely decreased in that he was only able to read 96 words per minute, and he struggled 'considerably with comprehension of material and with providing written responses to comprehension questions.'" (Pl.'s Objections at 9 (citations omitted) (quoting R. 292).) Similarly, the only evidence from May 31, 2006 report that plaintiff highlights in his brief is the statement that plaintiff often needed extra time to do his work and that he "appears to become easily frustrated if he has difficulty reading a word." (R. 152.)

Finally, plaintiff contends that the ALJ rejected Dr. Heckman's 2004 psychiatric evaluation but failed to provide any contrary medical evidence to support such rejection. I see no indication in the ALJ's decision that the ALJ rejected Dr. Heckman's report. In any event, the report has little probative value in assessing plaintiff's current ability to maintain concentration, persistence, or pace.

_____

[18] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1.

range of work at all exertional levels," subject to the following nonexertional limitation: "no detailed work tasks." (R. 15.) The ALJ explained that after reviewing the evidence, he found that plaintiff's "cognitive impairments would not prevent him from performing simple, repetitive work, on a sustained basis." (R. 16.) In reaching this conclusion, the ALJ expressly rejected the medical source statement of Dr. Husain, plaintiff's treating psychiatrist, asserting that it was not reasonably supported by Dr. Husain's limited treatment notes or other treatment notes in the record, and instead accorded substantial weight to the evaluation of Dr. Zimmerman, the consulting state-agency psychologist.

Plaintiff does not challenge the ALJ's rejection of Dr. Husain's report but contends that the ALJ's determination is not supported by substantial evidence, because the ALJ "failed to address whether there was any evidence to demonstrate that . . . plaintiff could 'sustain' such [simple, repetitive] work." (Pl.'s Objections at 13.) Plaintiff argues that the evidence demonstrates that he cannot sustain an ordinary routine without special supervision, that he suffers from anxiety and panic attacks, and that his ability to maintain concentration is severely limited.[19]

As discussed above, it is not possible to determine from the ALJ's decision whether the

_____

[19] Plaintiff refers to the list of mental abilities critical for performing unskilled work contained in the Social Security Administration's Program Operations Manual System ("POMS"), which is "the publicly available operating instructions for processing Social Security claims," *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 385 (2003). The POMS list corresponds closely to the "mental activities" described in the medical source statement completed by Dr. Husain. *See* POMS DI 25020.010. The ability to sustain an ordinary routine without special supervision is a specific mental ability within the broader functional area of "sustained concentration and persistence." *See* POMS DI 24510.090 ("Mental RFC Assessment Form SSA-4734-F4-SUP").

ALJ, in assessing plaintiff's limitations in the area of concentration, persistence, or pace, considered the teacher questionnaire completed by plaintiff's special-education reading teacher. Because this evidence is also relevant in assessing plaintiff's residual functional capacity, I cannot conclude that the ALJ's determination at this step of the analysis is supported by substantial evidence.

Further, there is no indication that the ALJ considered plaintiff's anxiety attacks in assessing plaintiff's residual functional capacity. At the hearing, when asked by the ALJ to explain "the problems you're experiencing that interfere with your ability to work," plaintiff replied that he has "anxiety attacks and . . . get[s] very nervous around people." (R. 25.) Plaintiff further testified that he did not drive because he had anxiety attacks (R. 28) and that he had stopped attending the special program at the intermediate unit because he had "too many panic attacks" (R. 29). Plaintiff had been diagnosed with an anxiety disorder in September 2003 and had been admitted to a partial hospitalization program as a result of anxiety attacks and hallucinations, and although his treating psychiatrist concluded that his anxiety was in remission by December 2004, in August 2008, when he began seeing Dr. Husain, plaintiff reported episodes of panic attacks.

In assessing plaintiff's residual functional capacity and any limitations that might affect the types of jobs that plaintiff could perform, however, the ALJ made no mention of plaintiff's anxiety. The ALJ stated that "[t]he claimant alleges that he cannot work because of his cognitive problems, and difficulties concentrating and staying focused" and asserted that, "[a]fter

considering the evidence of record," he found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below." The ALJ explained his reasons as follows:

> As discussed above, the claimant has received special education services, and is in vocational training. He has difficulty with reading, but has no physical impairments, or problems with motor functioning. The claimant's cognitive impairments would not prevent him from performing simple, repetitive work, on a sustained basis. He has some problems with speech, but is able to communicate adequately. The record shows that, with medication, his mood has been stable. His father stopped his medications, and when he resumed psychiatric treatment, in August 2008, he displayed depressed and manic symptoms, but was not suicidal or psychotic.

(R. 16.)

Although the ALJ could certainly have discounted plaintiff's testimony regarding his anxiety and panic attacks to the extent that he found that such testimony lacked credibility, there is no indication that the ALJ even considered such testimony or the other evidence in the record regarding plaintiff's anxiety. Indeed, beyond noting, in the context of his reasons for discounting Dr. Husain's medical source statement, that Dr. Husain had adjusted plaintiff's medications because plaintiff still had some anxiety and paranoia (R. 17), the ALJ did not mention plaintiff's anxiety attacks in his discussion of plaintiff's residual functional capacity.[20]

---

[20] At step three of the evaluation process, the ALJ apparently did consider whether plaintiff's impairments met the criteria for listing 12.06, which refers to anxiety-related disorders. But the paragraph B criteria for listing 12.06 are the same as those for listing 12.02, and the ALJ did not discuss plaintiff's alleged anxiety attacks in assessing whether plaintiff satisfied the criteria. Nor did the ALJ provide any discussion as to whether plaintiff's impairments met the paragraph A criteria for listing 12.06. (*See* R. 14–15.)

As discussed above, the ALJ rejected Dr. Husain's report and instead accorded substantial weight to Dr. Zimmerman's evaluation. I note, however, that plaintiff was not suffering from anxiety attacks when he met with Dr. Zimmerman in May 2007, and allegedly did not begin suffering anxiety attacks again until sometime after he began the program at the intermediate unit in September 2007. That might call into question Dr. Zimmerman's conclusions about plaintiff's ability to do work-related activities and any limitations that might affect the type of jobs that plaintiff could perform.[21, 22]

---

[21] Although plaintiff has not raised the issue, I note that the ALJ did not discuss the GAF score of 35 that Dr. Husain assigned plaintiff in August 2008—or plaintiff's previous GAF scores. While recognizing that a claimant's GAF score may not necessarily reflect a claimant's ability—or inability—to work, courts in this district have held that a GAF score "constitutes medical evidence accepted and relied upon by a medical source and must be addressed by an ALJ in making a determination regarding a claimant's disability," and have remanded where the ALJ failed to discuss the claimant's score. *Colon v. Barnhart*, 424 F. Supp. 2d 805, 812 (E.D. Pa. 2006). *But see Coy v. Astrue*, No. 08-1372, 2009 WL 2043491, at *14 (W.D. Pa. July 8, 2009) (finding no error where, "although the ALJ's decision [did] not address the GAF scores specifically, the ALJ [did] conduct an analysis of the medical evidence pertaining to the plaintiff's mental impairments"). Here, although the ALJ carefully explained his reasons for discounting the medical source statement completed by Dr. Husain in October 2008, the ALJ offered no reason for not considering the GAF score assessed by Dr. Husain in August, a score that was consistent with prior GAF scores received by plaintiff in 2003 and 2004. There may very well be legitimate reasons for according the GAF scores little weight here. But it is not for this court to speculate as to the ALJ's reasoning; it is incumbent upon the ALJ to explain his reasons for discounting such evidence.

[22] Although plaintiff has not raised this issue, I must also question the ALJ's reliance on SSR 85-15 and the medical-vocational guidelines, in lieu of a vocational expert, in determining that plaintiff was able to perform jobs that exist in significant numbers in the national economy. The Third Circuit has held that where, as here, a claimant has only nonexertional limitations, in order for the Commissioner "to rely on an SSR as a replacement for a vocational expert, it must be crystal-clear that the SSR is probative as to the way in which the nonexertional limitations impact the ability to work, and thus, the occupational base." *Allen v. Barnhart*, 417 F.3d 396, 407 (3d Cir. 2005). "While, surely, the Agency can use its rules as a substitute for individualized determination," the court asserted, "there must be a 'fit' between the facts of a given case, namely, the specific nonexertional impairments, and the way in which the Rule dictates that such nonexertional limitations impact the [occupational] base." *Id.* at 406. In *Allen*, the court held that

## IV.    CONCLUSION

It is not possible to determine from the ALJ's decision whether probative evidence was

rejected or simply ignored. As a result, I cannot conclude that the ALJ's decision is supported by

the ALJ's determination that the claimant had the ability to perform simple tasks prevalent in the national economy was not supported by substantial evidence, because the ALJ failed to focus on the claimant's limitations—namely, "difficult response to supervision, impaired ability to deal with changes in a work setting and job stress"—and to connect those specific limitations "to any applicable occupational base directives within SSR 85-15," *id.* at 406; the ALJ simply concluded that "[t]he mental limitations for simple, routine, repetitive work do not significantly erode the base of jobs that claimant is capable of performing," *id.* at 400.

Similarly, here, the ALJ stated that plaintiff's "ability to perform work at all exertional levels has been compromised by nonexertional limitations," but asserted, without any explanation, that "these limitations have little or no effect on the occupational base of unskilled work at all exertional levels." (R. 18.) The only nonexertional limitation that the ALJ cited was "no detailed work tasks." The ALJ did not discuss how plaintiff's alleged anxiety or his borderline intellectual functioning or his moderate difficulties in maintaining concentration, persistence, or pace would affect his ability to perform unskilled work or how such limitations would affect the occupational base. Had plaintiff raised this issue, I would have been unable to conclude that the ALJ's determination was supported by substantial evidence. *See Rivera v. Astrue*, No. 08-220, 2009 WL 1065920, at *11 (W.D. Pa. Apr. 20, 2009) (applying *Allen* and remanding to the Commissioner where the ALJ relied on the medical-vocational guidelines but failed to discuss how plaintiff's "moderate difficulties in maintaining social functioning" and "moderate difficulties with respect to concentration, persistence or pace" would affect her ability to perform unskilled work); *see also Meyler v. Comm'r of Soc. Sec.*, 238 F. App'x 884, 890 (3d Cir.2007) (not precedential) (holding that the ALJ's decision was not supported by substantial evidence where the ALJ relied on the medical-vocational guidelines and did not explain why plaintiff's anxiety did not prevent her from meeting the mental demands of unskilled work, but stated only that "unskilled jobs usually involve working with objects rather than people"); *cf. Ramirez v. Barnhart*, 372 F.3d 546, 554–55 (3d Cir. 2004) (holding that the ALJ's decision was not supported by substantial evidence because the requirement, in the ALJ's hypothetical to the vocational expert, that a job be limited to one- or two-step tasks, did not adequately encompass the finding that the claimant often had deficiencies in concentration, persistence, or pace); *Burns v. Barnhart*, 312 F.3d 113, 122–23 (3d Cir. 2002) (holding that ALJ's decision was not supported by substantial evidence where the ALJ's hypothetical to the vocational expert failed to mention the claimant's borderline intellectual functioning and instead referred only to "simple repetitive one, two-step tasks").

Finally, if in reconsidering this matter on remand the Commissioner intends to rely on the medical-vocational guidelines and a Social Security ruling in lieu of a vocational expert, "advance notice should be given" to plaintiff, "as a matter of fairness," so that he can call his own vocational expert if he so chooses. *Allen*, 417 F.3d at 407–08.

substantial evidence. Accordingly, I will sustain in part plaintiff's objections to the magistrate judge's report, and I will remand the matter to the Commissioner for further proceedings consistent with this memorandum. I take no position on whether plaintiff is disabled and eligible for disability benefits. I merely instruct that the ALJ consider all the relevant evidence and clearly explain his reasoning to the extent that he rejects or discounts any such evidence. The ALJ may take additional evidence if he deems it necessary in his discretion. *See Cotter*, 642 F.2d at 707.

An appropriate order accompanies this memorandum.